IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANDERSON DONALD AGUILAR TANCHEZ,<br><br>                    Petitioner,<br><br><br>v.<br><br><br>KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; MICHAEL BERNACKE, in his official capacity as Field Office Director of U.S. Immigration and Customs Enforcement; PAMELA BONDI, in her official capacity as the United States Attorney General; EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; and UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,<br><br>                    Respondents. | **MEMORANDUM DECISION AND ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS**<br><br><br><br>Case No. 2:25-cv-1150<br><br><br>Judge Tena Campbell |

Before the court is a petition for a writ of habeas corpus filed by Petitioner Anderson Donald Aguilar Tanchez under 28 U.S.C. § 2241.  (ECF No. 1.)   Mr. Aguilar Tanchez alleges that he is being unlawfully confined in violation of the Constitution and laws of the United States.  Specifically, he challenges a revised interpretation of the Immigration and Nationality Act recently issued by the Department of Homeland Security that would require immigration officials to place millions of people in mandatory detention pending the outcome of removal

proceedings, regardless of how long those individuals have lived in the country, regardless of whether those individuals have a criminal record, and regardless of whether those individuals have been found to be a flight risk or a danger to the community.  The court agrees with Mr. Aguilar Tanchez that DHS's interpretation of the statute is unlawful and therefore grants his petition.

## BACKGROUND

### I.    The Petitioner

Mr. Aguilar Tanchez[1] is a native and citizen of Guatemala who entered the United States at age 17 with his family sometime around November 2023.  (Decl. Matthew Randall, ECF No. 5-1 at ¶¶ 4–5.)  On November 12, 2023, agents from U.S. Customs and Border Protection (CBP) arrested and detained him without a warrant near the town of Eagle Pass, Texas.  (Id. ¶ 5.)

CBP issued Mr. Aguilar Tanchez a Notice to Appear (NTA), thereby initiating a removal proceeding against him under 8 U.S.C. § 1229a.  (Id. ¶ 6; NTA, ECF No. 1-2 at 38–40.)  The NTA charged him with being inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i), which states: "An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." (ECF No. 1-2 at 38.)  Specifically, the NTA alleged as follows: "You arrived in the United States at or near EAGLE PASS, TX, on or about November 12, 2023[.]  You were not then admitted or paroled after inspection by an Immigration Officer."  (Id.)  The NTA ordered Mr. Aguilar Tanchez to appear before an Immigration Judge in West Valley City, Utah, on October 24, 2025. (Id.)

---

[1] In a previous order, the court mistakenly referred to the Petitioner as Mr. Aquilar Tanchez. (See Order to Show Cause, Dec. 22, 2025, ECF No. 3.)  Both ICE records and the docket reflect that the Petitioner's correct name is Anderson Donald Aguilar Tanchez.

CBP then released Mr. Aguilar Tanchez on his own recognizance due to a lack of detention space. (Randall Decl. ¶ 5; Order of Release on Recognizance, ECF No. 1-2 at 31–34.) CBP issued him a Notice of Custody Determination that stated: "Pursuant to the authority contained in section 236 of the Immigration and Nationality Act[2] and part 236 of title 8, Code of Federal Regulations, I have determined that, pending a final administrative determination in your case, you will be [released on your own recognizance]." (Not. Custody Determination, ECF No. 1-2 at 37.)

On February 23, 2024, Merly Tanchez-Gallardo Aguilar, Mr. Aguilar Tanchez's mother, filed an Application for Asylum and for Withholding of Removal with the Executive Office of Immigration Review (EOIR), in which she named Mr. Aguilar Tanchez as a derivative beneficiary. (Form I-589, ECF No. 1-2 at 1–12.) The government asserts that Mr. Aguilar Tanchez filed written pleadings with EOIR on August 8, 2025, in which he admitted the allegations and conceded the removal charge in the NTA. (Randall Decl. ¶ 9.) EOIR subsequently cancelled the hearing date on which Mr. Aguilar Tanchez was scheduled to appear before the immigration court.[3] (Id. ¶ 7.)

On December 20, 2025, Mr. Aguilar Tanchez was arrested in the State of Utah on charges of Reckless Endangerment, in violation of Utah Code Ann. § 76-5-112, and Reckless Driving, in violation of Utah Code Ann. § 41-6a-526. (Id. ¶ 10.) At a hearing on Mr. Aguilar Tanchez's petition, the parties were unable to provide the court with further details or the status of these charges. But the parties do not dispute that Mr. Aguilar Tanchez was released from state custody on December 22, 2025, when he was then arrested by officers from U.S. Customs and

---

[2] INA § 236 is codified at 8 U.S.C. § 1126.

[3] The parties have not explained why this hearing date was cancelled. The court assumes that the cancellation was related to the pending asylum application.

Immigration Enforcement (ICE).  (Randall Decl. ¶ 11.)

Because ICE does not have detention facilities or contracts with independent detention

facilities in Utah that can accommodate detainees for longer than 72 hours, ICE transferred Mr.

Aguilar Tanchez to the Uinta County Detention Center in Wyoming.  (Id. ¶¶ 13–14.)  Mr.

Aguilar Tanchez is scheduled for a hearing in his removal proceeding before the Las Vegas

Immigration Court on January 26, 2026.  (Id. ¶ 15.)

## II.    Unauthorized Immigration in the United States

To understand the issues raised by Mr. Aguilar Tanchez's petition, it is helpful to

consider a snapshot of the size and composition of the unauthorized population in the United

States.

The government has suggested there are at least 15 million unauthorized immigrants

currently living in the United States.  See Noem v. Vasquez Perdomo, 222 L. Ed. 2d, 2025 WL

2585637, at *1 (Sept. 8, 2025) (Kavanaugh, J., concurring in the grant of the application for

stay).  The Congressional Research Service has found that the majority of this population is

made up of noncitizens who entered the United States without inspection, although a substantial

proportion of these individuals entered lawfully and overstayed the period of lawful admission or

violated the terms of their admission, such as the terms of a visa.  Congressional Research

Service, Unauthorized Immigrants: Frequently Asked Questions, at 4, CRS Report R47218

(Office of Congressional Info. & Publishing, Aug. 10, 2022).  Unauthorized immigrants are

ineligible for most federal benefits but may be required to pay federal taxes.  Id. at 6, 11.  As

of 2019, an estimated 58 to 62 percent of unauthorized immigrants had been living in the United

States for at least a decade.  Id. at 5.  Noncitizens, whether unauthorized or with lawful

immigration status, can be placed in removal proceedings based on inadmissibility or

deportability.  Id. at 15; see also 8 U.S.C. § 1229a.  As of the third quarter of the 2025 fiscal year, there were 3,797,662 pending removal proceedings.  See Executive Office for Immigration Review (EOIR), Adjudication Statistics: Pending Cases (Jul. 2025).

### III.  Overview of Immigration Law in the United States

The relevant statute governing this matter is the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 et seq., which was first passed in 1952 and consolidated several immigration laws into one statute.  The INA has been amended many times.  Most relevant to Mr. Aguilar Tanchez's petition are the amendments added by the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which was passed in 1996.  Pub. L. No. 104-208, 110 Stat. 3009–546.  IIRIRA added new grounds of inadmissibility and deportability, replaced deportation and exclusion proceedings with a framework for removal proceedings, created expedited removal procedures, and reduced the scope of judicial review over immigration decisions.

Under the Homeland Security Act of 2002, most of the functions previously performed by the Immigration and Naturalization Service (INS) were transferred to the new Department of Homeland Security (DHS).  Pub. L. 107–296, 116 Stat. 2135.  The Department of Justice (DOJ) retained the Executive Office for Immigration Review (EOIR), which oversees the Immigration Courts and the Board of Immigration Appeal (BIA).  The BIA is an appellate body within the EOIR that is "charged with the review of those administrative adjudications under the [INA] that the Attorney General may by regulation assign to it."  8 C.F.R. § 1003.1(d)(1).  The BIA reviews custody determinations made by Immigration Judges.  Id. § 1003.1(d)(14).  A majority of BIA members or the Attorney General may designate a BIA decision as precedent.  Id. § 1003.1(g)(2).

There are three principal agencies within DHS that enforce the INA: CBP, which

5

operates at the border; ICE, which operates in the interior of the country; and U.S. Citizenship and Immigration Service (USCIS), which processes applications for citizenship, lawful permanent residents, work permits, and asylum.

### IV.    The Revised Position Adopted by the Department of Homeland Security

As demonstrated by the facts in this case and discussed in more detail in the court's opinion below, DHS has generally followed the provisions of § 1226(a) to arrest and detain noncitizens present in the United States.  Those provisions allow a noncitizen to challenge their custody determination during a bond hearing in front of an Immigration Judge.

That practice changed on July 8, 2025, when DHS released a statement addressed to all ICE employees titled Interim Guidance Regarding Detention Authority for Applicants for Admission (Interim Guidance).[4]  In that guidance, DHS stated that it had "revisited its legal position on detention and release authorities" and determined that "section 235 of the Immigration and Nationality Act (INA), rather than section 236, is the applicable immigration detention authority for all applicants for admission."  The Interim Guidance continued:

> An "applicant for admission" is an alien present in the United States who has not been admitted or who arrives in the United States, whether or not at a designated port of arrival.  INA § 235(a)(1).  **Effective immediately, it is the position of DHS that such aliens are subject to detention under INA § 235(b) and may not be released from ICE custody except by INA § 212(d)(5) parole.**  These aliens are also ineligible for a custody redetermination hearing ("bond hearing") before an immigration judge and may not be released for the duration of their removal proceedings absent a parole by DHS.  For custody purposes, these aliens are now treated in the same manner that "arriving aliens" have historically been treated.  **The only aliens eligible for a custody determination and release on recognizance, bond, or other conditions under INA § 236(a) during removal proceedings are aliens admitted to the United States and chargeable with**

---

[4] Interim Guidance, AILA Doc. No. 25071607 (July 8, 2025), available at: https://perma.cc/5GKM-JYGX.

>**deportability under INA § 237, with the exception of those subject to mandatory detention under INA § 236(c).**[5]

That guidance did not immediately translate into changed practices at the BIA. Nearly a month after the DHS issued the Interim Guidance, the Attorney General designated the BIA's decision in Matter of Akhmedov "as precedent in all proceedings involving the same issue or issues." 29 I. & N. Dec. 166, 166 n.1 (BIA 2025). That was true even though the case involved a noncitizen who had entered the United States unlawfully but was nevertheless subject to the detention provisions of § 1226. Id. at 166–67. But on September 5, 2025, the BIA determined that the provisions of § 1225(b)(2) apply in these circumstances and that therefore Immigration Judges lack authority to hold bond hearings or grant bond to noncitizens who are present in the United States without admission. Matter of Yajure Hurtado, 29 I. & N. Dec. 216 (BIA 2025).

As a result of the DHS's Interim Guidance and the BIA's decision in Matter of Yajure Hurtado, the government now asserts that Mr. Aguilar Tanchez is subject to the mandatory detention provisions of § 1225(b)(2) and therefore ineligible for a bond hearing in front of an Immigration Judge.

## LEGAL STANDARD

A district court may grant a writ of habeas corpus to any person who "is in custody in violation of the Constitution or laws or treaties of the United States[.]" 28 U.S.C. § 2241(c)(3). The individual in custody bears the burden of establishing that his detention is unlawful. Walker v. Johnston, 312 U.S. 275, 286 (1941).

---

[5] INA § 235 is codified at 8 U.S.C. § 1225; INA § 236 is codified at 8 U.S.C. § 1226; INA § 237 is codified at 8 U.S.C. § 1227; INA § 212(d)(5) is codified at 8 U.S.C. § 1182(d)(5). This opinion generally refers to the United States Code provisions except in quoted materials.

## ANALYSIS

### I.    Jurisdiction

As a preliminary matter, the government contends that the court lacks jurisdiction to consider Mr. Aguilar Tanchez's petition due to the jurisdiction-stripping provisions found in the INA.  Specifically, the government cites 8 U.S.C. § 1252(b)(9), which states: "Judicial review of all questions of law and fact … arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order …."

Both the Supreme Court and the Tenth Circuit have characterized the scope of this provision as "narrow."  Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 19 (2020); Mukantagara v. U.S. Dep't of Homeland Sec., 67 F.4th 1113, 1116 (10th Cir. 2023).  Indeed, the Supreme Court has stated that "§ 1252(b)(9) 'does not present a jurisdictional bar' where those bringing suit 'are not asking for review of an order of removal[,]' 'the decision to detain them in the first place or to seek removal[,]' or 'the process by which their removability will be determined.'"  Regents, 591 U.S. at 19 (quoting Jennings v. Rodriguez, 583 U.S. 281, 294 (2018) (plurality opinion)).  Here, Mr. Aguilar Tanchez challenges the determination by DHS to detain him without bail.  That legal issue is separate from the consideration of the merits of his removal proceeding.  See 8 C.F.R. § 1003.19(d) (noting that an Immigration Judge's consideration of requests for "custody or bond … shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding").  And Mr. Aguilar Tanchez does not challenge DHS's discretion to detain him in the first place; he instead alleges that DHS has interpreted the INA unlawfully by denying him a bond hearing.

The court finds that Mr. Aguilar Tanchez's petition is similar to the challenge considered by the Supreme Court in <u>Jennings v. Rodriguez</u>.  In that case, noncitizens brought a class action contesting the legality of indefinite detention without a bond hearing under the mandatory detention provisions in §§ 1225 and 1226.  Writing for a plurality, Justice Samuel Alito noted that an expansive interpretation of the "arising from" language would prevent review of any claims arising from a noncitizen's detention pending removal proceedings, such as claims based on inhumane conditions of confinement and claims for assault against a fellow detainee.  <u>Jennings</u>, 583 U.S. at 293.

> Interpreting "arising from" in this extreme way would also make claims of prolonged detention effectively unreviewable.  By the time a final order of removal was eventually entered, the allegedly excessive detention would have already taken place.  And of course, it is possible that no such order would ever be entered in a particular case, depriving that detainee of any meaningful chance for judicial review.

<u>Id.</u>

Mr. Aguilar Tanchez's claims would also be effectively unreviewable if that review could only occur after a final order of removal, given that it would be too late for a court to order relief.  And although Justice Alito was writing for a plurality, three other justices writing in dissent also agreed that the Court had jurisdiction to hear the case: "Jurisdiction … is unaffected by 8 U.S.C. § 1252(b)(9), which by its terms applies only '[w]ith respect to review of an order under [§ 1252(a)(1)].'"  <u>Id.</u> at 355 (Breyer, J., dissenting) (citing § 1252(b)); <u>see also</u> <u>id.</u> at 326 (Thomas, J., concurring in part and concurring in the judgment) (recognizing that "a majority of the Court has decided to exercise jurisdiction").

Given the similarities with <u>Jennings v. Rodriguez</u>, the court finds that § 1252(b)(9) does not present a jurisdictional bar.

II.   The Lawfulness of Mr. Aguilar Tanchez's Detention under the INA

A.  The Text of Sections 1225 and 1226

Turning to the merits, the court begins with an analysis of the relevant statutory text.  As the Supreme Court has noted, "[t]o implement its immigration policy, the Government must be able to decide (1) who may enter the country and (2) who may stay here after entering." Jennings, 583 U.S. at 286.

That process begins at the country's borders and ports of entries, "where the Government must determine whether an alien seeking to enter the country is admissible."  Id. at 287.  The statutory provisions explaining the requirements under which immigration officers inspect noncitizens to determine their admissibility are found at 8 U.S.C. § 1225.  The statute broadly defines "applicants for admission" as follows: "An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival …) shall be deemed for purposes of this chapter an applicant for admission."  8 U.S.C. § 1225(a)(1).  The statute then requires that "[a]ll aliens … who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers."  Id. § 1225(a)(3).

Under § 1225(b), titled "Inspection of applicants for admission," applicants for admission fall into one of two categories.  The first category is found under § 1225(b)(1), titled "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," which requires an immigration officer to place an applicant for admission in expedited removal proceedings if the officer determines that the applicant is inadmissible due to fraud, misrepresentation, or lack of valid entry documents.  Id. § 1225(b)(1)(A)(i) (citing id. §§ 1182(a)(6)(C), (a)(7)).  Upon designation, the Secretary may extend the category of applicants

for admission who are subject to expedited removal to noncitizens who have not been admitted or paroled and who have not been physically present in the United States for at least two years. Id. § 1225(b)(1)(A)(iii).  Applicants for admission who are subject to expedited removal proceedings are removed from the country "without further hearing or review" unless the applicant indicates either an intention to apply for asylum or a fear of persecution.  Id. § 1225(b)(1)(A)(i).  If an applicant does indicate such an intention or fear, the applicant "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."  Id. § 1225(b)(1)(B)(iii)(IV).

The second category is found under § 1225(b)(2), which is titled "Inspection of other aliens" and acts as a "catchall provision that applies to all applicants for admission not covered by § 1225(b)(1) …."  Jennings, 281 U.S. at 287.  That provision states: "[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."  8 U.S.C. § 1225(b)(2)(A).  The Supreme Court has clarified that detention under this provision is mandatory ("the alien shall be detained") and continues until removal proceedings have concluded.  Jennings, 281 U.S. at 297.

Although § 1225(b)(2) mandates detention, an individual detained under this section may apply for parole under § 1182(d)(5).  See also 8 C.F.R. § 212.5 (listing individuals who are eligible for parole).  The Secretary may grant parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit …."  8 U.S.C. § 1182(d)(5)(A).  A parolee is eligible for certain benefits, including ceasing to accrue unlawful presence time, see id. § 1182(a)(9)(B)(ii), and the ability to apply for adjustment of status under § 1255(a).  See Ortega-Cervantes v. Gonzales, 501 F.3d 1111, 1119 (9th Cir. 2007) ("Congress responded in

11

IIRIRA by narrowing the circumstances in which aliens could qualify for 'parole into the United States' under § 1182(d)(5)(A) and thus become eligible for adjustment of status.").

The government must also decide whether noncitizens who have entered the country are allowed to stay.  Section 1226 "creates a default rule" for "aliens already present in the United States."  <u>Jennings</u>, 281 U.S. at 303.  That section states: "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a).  Except as provided in § 1226(c), individuals detained under this provision may be released on bond or conditional parole.  <u>Id.</u> § 1226(a)(2).  And if ICE orders that an individual be detained, that detainee may request a custody redetermination—i.e., a bond hearing—in front of an Immigration Judge.  8 C.F.R. §§ 1003.19(a) ("Custody and bond determinations made by [ICE] pursuant to 8 CFR part 1236 may be reviewed by an Immigration Judge pursuant to 8 CFR part 1236."), 1236.1(d)(1) (providing that a noncitizen may "request amelioration of the conditions under which he or she may be released").  During the bond hearing, the noncitizen must "establish to the satisfaction of the Immigration Judge … that he or she does not present a danger to persons or property, is not a threat to the national security, and does not pose a risk of flight."  <u>In re Guerra</u>, 24 I. & N. Dec. 37, 38 (BIA 2006).  Either the detainee or DHS may appeal the Immigration Judge's decision to the BIA.  8 C.F.R. §§ 1003.1(d)(1), 1236.1(d)(3)(i).

Section 1226(c) operates as an exception to this default rule and "carves out a statutory category" of noncitizens for whom detention is mandatory.  <u>Jennings</u>, U.S. 281 at 289.  That category is comprised of individuals who have committed certain "enumerated … criminal offenses [or] terrorist activities."  <u>Id.</u>  Among the individuals subject to this mandatory detention provision are both noncitizens who are deemed "inadmissible" under § 1182, <u>see</u> 8 U.S.C.

§§ 1226(c)(1)(A), (D), (E), and noncitizens who are "deportable" under § 1227, see id.

§§ 1226(c)(1)(B), (C), (D).  Several of these categories were added a year ago after passage of

the Laken Riley Act.  Pub. L. No. 119-1, 139 Stat. 3 (2025); 8 U.S.C. § 1226(c)(1)(E).

Specifically, these amendments to the INA require mandatory detention for an individual who is

inadmissible under either § 1182(a)(6)(A) (for entering without inspection), 1182(a)(6)(C)

(misrepresentation), or 1182(a)(7) (lacking valid documentation) and who has been arrested for,

charged with, or convicted of certain crimes.  Id.

　　　To summarize the statutory provisions, the INA proposes two detention schemes that are

relevant here.[6]  The first, under § 1225, applies "primarily to aliens seeking entry into the United

States" and requires the detention of noncitizens who do not pass muster during the inspection

process.  Jennings, 583 U.S. at 297.  Noncitizens detained under this framework may only be

released under the parole provisions contained in § 1182(d)(5).  The second detention scheme,

under § 1226, is a "default rule" for "aliens already present in the United States" that allows

noncitizens to challenge their detention through a bond hearing in front of an Immigration Judge.

Id. at 303.  Noncitizens detained under this framework may be released with a bond or under

conditional parole.  8 U.S.C. § 1226(a)(2).

　　　This generalized reading of the statute distinguishes § 1225 from § 1226 spatially and

temporally: while § 1225 applies to noncitizens at or near the border who are entering or who

have recently entered, § 1226 applies to noncitizens in the interior of the country who have lived

in the country for some time.

---

[6] The INA also authorizes the detention of noncitizens after they have received a final order of
removal.  8 U.S.C. § 1231(a)(2).

As discussed in further detail below, DHS policies and practices have previously accorded with that generalized understanding.  But the government now asserts that there are no geographic or temporal limitations that restrict the reach of § 1225.  The government points to the broad language defining an "applicant for admission," noting that the term encompasses not just arriving noncitizens but any "alien present in the United States who has not been admitted[.]"  8 U.S.C. § 1225(a)(1).  The government then maintains that the catchall provision of section 1225(b)(2) applies to all individuals who have not been admitted, regardless of whether those individuals are arriving or recently arrived noncitizens, and regardless of whether those individuals are at or near the border.

There is some statutory support for the government's position.  The court agrees that Mr. Aguilar Tanchez is an applicant for admission under the terms of § 1225(a) because he is present in the United States and has not been admitted.  It is therefore possible that § 1225(b)(2) could apply to him, as that provision uses the term "applicant for admission" rather than the more restrictive term "arriving alien."  The statute elsewhere demonstrates that Congress knows how to limit the statute's reach to arriving noncitizens.  For instance, the expedited removal provisions found in § 1225(b)(1) extend only to arriving noncitizens unless the Secretary designates—within certain prescribed limits—that those provisions should extend to other noncitizens who have not been admitted or paroled.  Why, then, did Congress not use the term "arriving aliens" if it intended that § 1225(b)(2) should only apply to individuals at or near the border?

One potential response is that by using expansive language, the statute provides CBP with more flexibility at the border.  If § 1225(b)(2) were restricted to "arriving aliens" rather than "applicants for admission," then CBP might not be able to establish that certain noncitizens, even

14

if they were encountered near the border, qualified as "arriving aliens" due to difficulties proving the date of entry.  But this explanation does not fully answer the question presented in this case, which asks whether the government has correctly interpreted § 1225(b)(2) to apply even more broadly to <u>all</u> individuals who have entered without inspection, regardless of the time they have spent in the country.

The court finds that, despite some ambiguity in the specific provision, the government's interpretation does not comport with the statutory text and structure when read as a whole. Moreover, the government's interpretation is in tension with legislative history and longstanding agency practice.  Finally, the government's approach raises serious constitutional concerns, practical challenges, and questions about whether the government may change course during the middle of an individual's removal proceeding without upsetting the balance of rights and restrictions that Congress intended.

First, both the text and structure of the statute suggest that the procedures and requirements of § 1225 are directed at the border context.  Section 1225(b)(2) does not simply state that an "applicant for admission" shall be detained for failure to prove their admissibility; rather, the full text of the statute reads: "[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained…."  8 U.S.C. § 1225(b)(2).  The provision thus restricts its reach to applicants for admission who are 1) seeking admission; and 2) questioned by an examining immigration officer.  These active verbs suggest a moment in time when a noncitizen is crossing or has recently crossed a border,

not an indefinite status that applies whenever a noncitizen charged with inadmissibility encounters an immigration official.[7]

Moreover, this subsection is titled "Inspection of other aliens." The statute does not define "inspection," but that term is primarily used in § 1225. Where the INA uses the term elsewhere, that use supports a definition of "inspection" as the process by which immigration officers determine whether a noncitizen is legally allowed to enter the United States. Under 8 U.S.C. § 1255, for instance, a nonimmigrant may apply for an adjustment of status to that of a person admitted as a permanent resident provided that 1) they were "inspected and admitted or paroled into the United States" or 2) if they "entered the United States without inspection[,]" that they meet certain additional requirements. 8 U.S.C. §§ 1255(a), (i)(1)(A)(i). It does not appear that a noncitizen may qualify for the first prong, rather than the second, simply by arguing that they were inspected in Salt Lake City or elsewhere in the interior. The adjustment of status requirements contained in § 1255 therefore suggest that inspection is a process that occurs at the border. And that meaning should extend to how the court interprets the term "inspection" as it is used in § 1225 as well. Powerex Corp. v. Reliant Energy Servs., Inc., 551 U.S. 224, 232 (2007) ("[I]dentical words and phrases within the same statute should normally be given the same meaning.").

---

[7] Some courts have similarly narrowed the category of "applicants for admission" referenced in § 1225(b)(2) to those who are "seeking admission" at a certain point in time. See, e.g., Escobar Salgado v. Mattos, No. 2:25-cv-1872-RFB-EJY, 2025 WL 3205356, at *15. The government argues that all applicants for admission can be said to be seeking admission, pointing to a different statutory provision that references noncitizens "who are applicants for admission or otherwise seeking admission …." 8 U.S.C. § 1225(a)(3). The court does not fully resolve this dispute but instead finds that the use of active verbs coupled with the use of the term "inspection" indicates that § 1225(b)(2) applies to the border context.

Nevertheless, the court notes that § 1225(b)(1) refers to the "[i]nspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled" and permits the Secretary to extend the procedures and eligibility for expedited removal to some noncitizens who have not been in the country continuously for two years. As a result, there is at least some ambiguity about whether the definition of "inspection" can extend past the border context. But it is notable that, as the District of Columbia Circuit has explained, expedited removal procedures have until recently been restricted to the border: "For decades, the government limited its application of Expedited Removal to (1) persons who, within fourteen days of arriving in the United States, are encountered within 100 air miles of a land border, and (2) persons arriving by sea." Make the Road N.Y. v. Noem, No. 25-5320, 2025 WL 3563313, at *2 (D.C. Cir. Nov. 22, 2025). In that decision, the District of Columbia Circuit denied a request for an administrative stay after finding that a DHS designation expanding expedited removal procedures to noncitizens arrested anywhere in the country who could not adequately demonstrate continuous presence for at least two years was likely unconstitutional. Id. at *3. The court discusses this decision more fully below, as it finds that many of the constitutional concerns raised by the District of Columbia Circuit would be implicated by an expansion of the scope of § 1225(b)(2) to all applicants for admission anywhere in the country. For now, the court simply notes that there has been a longstanding practice to interpret the term "inspection" as related both spatially and temporally to the border and to border crossings.

But even if the court has some doubts that the text of § 1225, without more, is sufficient to resolve all questions about the section's applicability, the text of § 1226 removes those doubts. The government has not argued, nor can it, that § 1226 does not apply to Mr. Aguilar Tanchez. That section allows the Attorney General to arrest, detain, and place in removal proceedings any

noncitizen in the United States, and it is uncontested that Mr. Aguilar is a noncitizen present in the United States. Instead, the government asserts that § 1226, which provides detention authority for noncitizens present in the county, is more general than § 1225, which provides detention authority for applicants for admission. And if "there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." Guidry v. Sheet Metal Workers Nat. Pension Fund, 493 U.S. 365, 375 (1990) (citations omitted).

The court is not persuaded. The government's reading of the statute renders certain provisions of § 1226 redundant. Most importantly, the Laken Riley Act added § 1226(c)(1)(E), which mandates detention for noncitizens who are inadmissible under §§ 1182(a)(6)(A), (a)(6)(C), or (a)(7) and who have been charged with, arrested for, or convicted of certain crimes. The clear implication of this rule is that mandatory detention does not apply to someone who is charged with inadmissibility under the relevant provisions but not with the requisite crimes. Instead, the default rule set by § 1226(a) allows for discretionary detention of these noncitizens. Mr. Aguilar Tanchez, for instance, is charged with inadmissibility under § 1182(a)(6)(A)(i), but the government has not alleged that he has been charged with any of the crimes listed under the Laken Riley Act. The mandatory detention exception under § 1226(c) therefore does not apply to him, and he should be processed according to the discretionary default detention provisions of § 1226(a).

The redundancies created by the government's reading of the statute extend beyond the Laken Riley Act. Under IIRIRA, the § 1226(c) mandatory detention requirement applies both to certain deportable noncitizens (see 8 U.S.C. §§ 1226(c)(1)(B), (C), (D)) and to certain inadmissible noncitizens (see id. §§ 1226(c)(1)(A), (D)). If Congress had intended § 1225(b)(2) to apply to all noncitizens who had not been admitted, regardless of whether they were detained

at the border, then there would have been no need to again specify mandatory detention for certain categories of inadmissible noncitizens (but not others) under § 1226(c).

The government asserts that redundancies "are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication." Barton v. Barr, 590 U.S. 222, 239 (2020). But the redundancies created by the government's interpretation of the statute are not simply repetitive—they create unnecessary tension between the statutory provisions. After all, § 1225(b)(2) and § 1225(c) mandate different categories of detention with different requirements. An applicant detained under § 1225(b)(2) may only be released under the parole provisions of § 1182(d)(5) for "urgent humanitarian reasons or significant public benefit …." In contrast, a noncitizen detained under § 1226(c) may only be released to provide protection to witnesses and other people cooperating with an investigation, provided that the Secretary determines that the noncitizen is not a flight risk or a danger to the community. 8 U.S.C. § 1226(c)(4). Under the government's interpretation, a noncitizen living in the country who has not been admitted must be detained under § 1225(b)(2), which is more specific than § 1226(a). But if that noncitizen is inadmissible for the reasons listed in § 1226(c), then arguably the more restrictive detention conditions specified by that subsection should trump the detention scheme required under § 1225(b)(2). The court does not believe that the statute requires such a bewildering hopscotch of application.

Consider also the differing detention requirements between § 1225(b)(2) and § 1226(a). As noted above, an applicant detained under § 1225(b)(2) may only be released under the parole provisions of § 1182(d)(5), which apply in a limited set of circumstances. But noncitizens released under those provisions are also granted more rights, including the ability to apply for

work authorization and adjustment of status.  In contrast, § 1226(a) specifically forbids the

Secretary from providing a noncitizen released on conditional parole (other than legal permanent

residents) with a work authorization.  Id. § 1226(a)(3).  And noncitizens released on conditional

parole under § 1226(a) are not eligible for adjustment of status.  Accordingly, the various grants

of authority under which the Secretary may detain a noncitizen under the INA are not simply

redundant—they impose entirely different detention schemes.

For all these reasons, the court finds that § 1225 primarily applies to inspections at the

border, whereas § 1226 applies to noncitizens living in the country.  While the provisions of

§ 1226(a) clearly apply to Mr. Aguilar Tanchez, there is substantial doubt about whether the

provisions of § 1225(b)(2) also apply.  The government has therefore failed to show that the

mandatory detention requirement of § 1225(b)(2) must supersede the discretionary detention

requirement of § 1226(a)—and, as a result, the court finds that the government's refusal to

permit Mr. Aguilar Tanchez an opportunity to challenge his custody determination in front of an

Immigration Judge is unlawful.

### B.  Legislative History

Recognizing that the provisions of the INA have been compared to a "Gordian knot,"

Aguilar v. U.S. Immig. & Customs Enf't, 510 F.3d 1, 6 (1st Cir. 2007), the court also considers

its analysis of the statute in the context of legislative history and longstanding agency practice.

Prior to the enactment of IIRIRA, there were two distinct types of proceedings in which

noncitizens could be denied entry or removed from the United States: deportation hearings and

exclusion hearings.  Landon v. Plasencia, 459 U.S. 21, 25 (1982).  Deportation hearings were the

"usual means of proceedings against an alien already physically in the United States," whereas

exclusion hearings were the "usual means of proceeding against an alien outside the United

States seeking admission." Id.  The distinction between the two proceedings was important because "non-citizens who had entered without inspection could take advantage of the greater procedural and substantive rights afforded in deportation proceedings, while non-citizens who presented themselves at a port of entry for inspection were subjected to more summary exclusion proceedings." Hing Sum v. Holder, 602 F.3d 1092, 1100 (9th Cir. 2010).  For a noncitizen subject to a deportation proceeding, these procedural and substantive rights included, in most cases: 1) seven days' notice of the charges; 2) the opportunity for an appeal to the Court of Appeals; 3) the right to designate the country of deportation; 4) the right to depart voluntarily; and 5) the right to seek suspension of deportation.  Landon, 459 U.S. at 26–27.  Because access to these substantive rights hinged on the physical presence of a noncitizen within the United States, the pre-IIRIRA framework "created an anomaly whereby immigrants who were attempting to lawfully enter the United States were in a worse position than persons who had crossed the border unlawfully."  Torres v. Barr, 976 F.3d 918, 928 (9th Cir. 2020) (citations omitted).

The enactment of IIRIRA and the addition of § 1225(a)(1), which defines "applicants for admission" to include noncitizens who have not been lawfully admitted (even if they are physically present within the United States), "ensure[d] that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings under the INA …."  Torres, 976 F.3d at 928; see also H.R. Rep. 104-469, pt. 1, at 225 (1996) (explaining that § 1225(a)(1) "[wa]s intended to replace certain aspects of the current 'entry doctrine,' under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry").

The government maintains that an interpretation of the INA subjecting Mr. Aguilar Tanchez to the discretionary detention framework of § 1226(a) would undo the fix created by Congress by granting Mr. Aguilar Tanchez a privilege not available to him if he had presented himself at a port of entry.  This argument misunderstands both the nature of the distinction between §§ 1225 and 1226, as well as the extent of the fix that IIRIRA provided.  First, the government assumes that it is always better to be subject to the discretionary detention provisions of § 1226 rather than the mandatory detention provisions of § 1225.  But as the court has discussed, a noncitizen detained under § 1225 may apply for humanitarian or significant public benefit parole under § 1182(d)(5).  Although that application will be considered by USCIS rather than by an Immigration Judge, and while it is likely less common for detainees to be granted parole under those provisions, a grant of parole under § 1182(d)(5) provides a parolee with greater rights to work or apply for adjustment of status.

Moreover, IIRIRA did place noncitizens charged with inadmissibility, whether at a port of entry or within the country, on equal footing concerning the procedures and the burden of proof in removal proceedings.  See 8 C.F.R. § 1003.19(d) (noting that an Immigration Judge's consideration of requests for "custody or bond … shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding").  "Now, in removal proceedings, the relevant distinction for procedural purposes is whether the immigrant has been lawfully admitted, regardless of actual physical presence." Torres, 976 F.3d at 928. Specifically, the framework enacted by IIRIRA requires that an applicant for admission, regardless of physical presence, must prove either "clearly and beyond doubt" that they are entitled to be admitted or, "by clear and convincing evidence," that they are lawfully present in the United States due to a prior admission.  8 U.S.C. § 1229a(c)(2).  In contrast, in the case of a

noncitizen who has been lawfully admitted but is charged with deportability, it is the DHS who has the burden of establishing "by clear and convincing evidence" that the noncitizen is deportable.  Id. § 1229a(c)(3).

The court finds no reason to assume that Congress's stated concern about procedural and substantive discrepancies in removal proceedings would also extend to detention determinations. After all, there are good reasons why Congress would provide for mandatory detention at the border but discretionary detention within the country.  As another district court has explained:

> [N]oncitizens who have lived for years in this country are more likely to be working in critical industries, parenting U.S. citizen children, or otherwise serving their communities.  The mass detention of these individuals—without regard to flight risk or danger to the public—is far more disruptive to local American economies, families, and communities than the detention of noncitizens who have just crossed the border.

Rodriguez v. Bostock, No. 3:25-cv-5240-TMC, 2025 WL 2782499, at *24 (W.D. Wash. Sept. 30, 2025) (cleaned up).

In any event, there is other evidence in the Congressional record that favors Mr. Aguilar Tanchez's position.  Most importantly, noncitizens present in the United States, like Mr. Aguilar Tanchez, would have been subject to deportation proceedings before the enactment of IIRIRA. See Hose v. I.N.S., 180 F.3d 992, 994 (9th Cir. 1999) ("A deportation hearing was the usual means of proceeding against an alien already physically in the United States[.]" (cleaned up)). And the predecessor statute to § 1226(a) also provided for discretionary release on bond for these individuals.  See 8 U.S.C. § 1252(a)(1) (1994) ("[A]ny such alien taken into custody may, in the discretion of the Attorney General … be continued in custody … [or] be released under bond[.]").  When passing IIRIRA, Congress declared: "Section [1226(a)] restates the current provisions in section [1252(a)] regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States."  H.R. Rep. No. 104-469,

pt. 1, at 229.  Notably, Congress also referred to § 1225(b)(2) as a provision that applied to the "[i]nspection of other arriving aliens."  Id.

The court therefore finds that legislative history, on balance, supports the court's interpretation of the statute.  That was true when Congress passed IIRIRA, and it remained true when Congress amended the INA by passing the Laken Riley Act.  As the court has discussed, the Laken Riley Act added provisions to § 1226, not to § 1225.  And by specifying that some noncitizens charged with inadmissibility should be subject to mandatory detention, these amendments reflect a Congressional understanding that other noncitizens charged with inadmissibility remain subject to the discretionary detention provisions of § 1226(a).

### C.  Agency Practice

At the hearing on the petition, counsel for the government candidly admitted that the recent Interim Guidance issued by DHS, as well as the BIA decision in Matter of Yajure Hurtado, represent a break from DHS's previous practice.  Indeed, the Interim Guidance states that DHS "has revisited its legal position on detention and release authorities" and specifically notes that any noncitizens present in the United States who have not been admitted will now be "treated in the same manner that 'arriving aliens' have historically been treated."[8]

The agency's previous position is reflected in an interim rule issued six months after the passage of IIRIRA by the agencies then charged with enforcing immigration laws, in which the agencies explained:

> Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination…. The effect of this change is that inadmissible aliens, except for arriving aliens, have available to them bond redetermination hearings before an immigration judge, while arriving aliens do not.  This procedure maintains the status quo ….

---

[8] See Interim Guidance, supra note 4.

62 Fed. Reg. 10312, 10323 (Mar. 6, 1997).  And regulations still in effect suggest that

Immigration Judges may hold bond hearings for noncitizens charged with inadmissibility in

removal proceedings.  See 8 C.F.R. § 1003.19(h)(2) (prohibiting Immigration Judges from

holding bond hearings for arriving noncitizens in removal proceedings and noncitizens subject to

mandatory detention under § 1226(c) but containing no similar prohibition for noncitizens

charged with inadmissibility who are not arriving and who are not subject to § 1226(c)).

 As the Supreme Court has recently clarified, the court need not defer to either the DHS's

most recent interpretation or its longstanding practice.  Loper Bright Enters. v. Raimondo, 603

U.S. 369, 412 (2024).  While "the judgment of the Executive Branch may help inform" the

court's inquiry, it does so only to the extent of its "power to persuade."  Id. at 413, 402 (quoting

Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).  Nevertheless, "the longstanding practice

of the government—like any other interpretive aid—can inform [a court's] determination of what

the law is."  Id. at 386 (cleaned up).

 The court finds that DHS's longstanding practice is more persuasive than its recent

Interim Guidance.  For the reasons stated above, the court disagrees with the analysis provided

by the BIA in Matter of Yajure Hurtado as a matter of law.  The court also notes that the decision

is inconsistent with previous BIA decisions, including a decision that was designated as

precedent only a month earlier.  See Matter of Akhmedov, 29 I. & N. Dec. at 166 n.1 (designated

as precedent on Aug. 4, 2025).  In that case, the BIA stated that a noncitizen who had entered the

United States unlawfully three years earlier was subject to the discretionary detention provisions

in § 1226(a).  Id.; see also Matter of Yajure Hurtado, 29 I. & N. Dec. at 226 (agreeing that, in

Matter of Akhmedov, the respondent's custody was governed by § 1226(a) even though the

respondent was present in the United States without inspection).  Explaining the inconsistency,

25

the BIA noted that the question about mandatory detention under § 1225(b)(2) had not been presented to the BIA in <u>Matter of Akhmedov</u>.  <u>Matter of Yajure Hurtado</u>, 29 I. & N. Dec. at 226. But the lack of discussion is telling: the BIA simply assumed, as did DHS for decades, that detention under § 1226(a) was permissible.  Until the recent Interim Guidance issued by DHS, it appears that such a position was unremarkable.

Finally, the court notes that if DHS is correct that § 1226(a) cannot apply to noncitizens living in the country who have not been admitted, then it would appear that DHS has acted unlawfully in millions of cases over the past several decades by allowing the conditional release of detainees such as Mr. Aguilar Tanchez without following the humanitarian or substantial public benefit parole requirements of § 1182(d)(5).  As the Interim Guidance notes, the new DHS position is that noncitizens present in the United States who have not been admitted are subject to detention under § 1225(b) and "may not be released from ICE custody except by INA § 212(d)(5) parole."  Under what authority, then, were individuals like Mr. Aguilar Tanchez previously released pending a determination in their removal proceeding?  And what is the legal status of those individuals now?  Given the magnitude of the legal questions raised, the court finds unpersuasive any guidance that does not attempt to answer these uncertainties.  The court therefore disregards the DHS's revised legal position and finds that DHS's previous interpretation of the statute serves as a better guidepost.

### D.  Supreme Court Interpretations

The Supreme Court has not yet been asked to address the exact boundary between § 1225 and § 1226, although the Court discussed the statutory detention scheme extensively in <u>Jennings v. Rodriguez</u> when considering the mandatory detention requirements of §§ 1225(b) and 1226(c) and the permissive detention framework of § 1226(a).  583 U.S. at 287–89.  Both parties seize on

language from the Supreme Court's opinion in support of their statutory framework.  The

government notes that the Court describes § 1225(b)(2) as "broader" than § 1225(b)(1) and as a

"catchall provision that applies to all applicants for admission not covered by § 1225(b)(1) …."

Id. at 287.  Mr. Aguilar Tanchez, in contrast, notes the Court's statement that "§ 1226 applies to

aliens already present in the United States" and "creates a default rule for those aliens …."  Id.

at 303.  This court finds that neither description is dispositive, but that both reflect the broad

language used in §§ 1225 and 1226.

        A better indication of how the Supreme Court understands the distinction between the

two sections is found in Department of Homeland Security v. Thuraissigiam, in which the Court

held that § 1252(e)(2), which limits additional administrative review of an asylum seeker's

credible fear of persecution claim, did not violate either the Suspension Clause or the Due

Process Clause.  591 U.S. 103, 140–41 (2020).  The Court noted that the asylum seeker in that

case did not contest his detention during the pendency of his asylum review because it was

undisputed that "he was apprehended in the very act of attempting to enter this county" and that

he was inadmissible because he lacked an entry document.  Id. at 118–19.  In support of the

asylum seeker's inadmissibility, the Court cited §§ 1182(a)(7) (the inadmissibility provision for

lack of entry documents) and 1225(b)(1) (the expedited removal provision).  Id.  But the Court

went on to state that "simply releasing him would not provide the right to stay in the country that

his petition ultimately seeks.  Without a change in status, he would remain subject to arrest,

detention, and removal."  Id. at 119.  In support of this statement, the Court did not cite

§ 1225(b)(2), even though it was clear that the asylum seeker was inadmissible without a change

in status.  Instead, the Court cited § 1226(a).  Id.  In other words, the Court understood that an

asylum seeker who had not been admitted to the United States and who was subject to the

detention provisions of § 1225(b) at the border would nevertheless be subject to arrest and detention under § 1226(a) if he were released into the country with no change in status.

While the Court was not directly presented with the question of whether § 1225(b)(2) could <u>also</u> apply to an inadmissible asylum seeker living in the country, the Court's reference to § 1226(a) in this context is consistent with the Congressional record, longstanding agency practice, and this court's interpretation of the statute.

### E.  Constitutional Concerns

Although the INA is not a model of clarity, the court finds that the statutory text and structure, coupled with support from legislative history, longstanding agency practice, and the Supreme Court's discussion of the statute, indicate that DHS's current interpretation of the statute is unlawful.  But even if the court agreed with the government that § 1225(b)(2) could be read to apply to noncitizens in the interior of the country, the court would still read § 1226(a) to apply to those noncitizens as well.  As a result, the government would have established at most that the statute was ambiguous.  And where a statute is "genuinely susceptible to two constructions[,]" the court must consider the canon of constitutional avoidance.  <u>Doe v. City of Albuquerque</u>, 667 F.3d 1111, 1120 (10th Cir. 2012) (quoting <u>Conzales v. Carhart</u>, 550 U.S. 124, 154 (2007)).

The canon of constitutional avoidance "provides that when a particular construction would raise serious constitutional problems, the court will avoid that construction unless doing so would plainly conflict with Congress's intent."  <u>Olmos v. Holder</u>, 780 F.3d 1313, 1321 (10th Cir. 2015) (citing <u>Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council</u>, 485 U.S. 568, 575 (1988)).  Constitutional avoidance "come[s] into play only if the statute is ambiguous."  <u>Id.</u> at 1322.

To the extent that the court has noted some ambiguity due to the broad language in § 1225(b)(2), the court also finds that the government's application of that broad language to reach noncitizens living far from the border raises serious constitutional concerns and must therefore be rejected in favor of the court's interpretation of the statute, which is more plausible and less constitutionally problematic.

The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving any "person" of "life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. There is no question that Fifth Amendment protections extend to noncitizens present in the United States. See Zadvydas v. Davis, 533 U.S. 678, 693 (2001). Indeed, "'it is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings …." Trump v. J.G.G., 145 S. Ct. 1003, 1006 (2025) (quoting Reno v. Flores, 507 U.S. 292, 306 (1993)). As a result, persons "who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953).

Due process protections are "vital in determining a person's eligibility for deportation or removal from the United States." Make the Road N.Y., 2025 WL 3563313, at *21. Indeed, the Supreme Court has recognized that "deportation is a particularly severe 'penalty' [even if] it is not, in a strict sense, a criminal sanction." Padilla v. Kentucky, 559 U.S. 356, 365 (2010) (quoting Fong Yue Ting v. United States, 149 U.S. 698, 740 (1893)).

As noted above, the District of Columbia Circuit recently considered a new DHS designation extending the reach of expedited removal procedures to the maximum authorized by statute—i.e., to include citizens who cannot show that they have been continuously present for

two years prior to the date of determination of inadmissibility, 8 U.S.C. § 1225(a)(1)(iii)(II).

Make the Road N.Y., 2025 WL 3563313.  The Circuit Court denied a motion for an

administrative stay, finding that DHS's extension of expedited removal procedures—even

though clearly allowed under the statute—was unlikely to pass constitutional muster.  Id. at *25.

That was true even though the Circuit Court recognized that "Congress is entitled to set the

conditions for an alien's lawful entry into this country and that, as a result, an alien at the

threshold of initial entry cannot claim any greater rights under the Due Process Clauss."  Id. at

*23 (quoting Thuraissigiam, 591 U.S. at 107).

        First, the Circuit Court distinguished parolees under § 1182(d)(5) from "those who are

present without authorization …."  Id.  Although the Supreme Court has treated parolees who

arrive at ports of entry, even those paroled for years pending removal, "as if stopped at the

border[,]" Thuraissigiam, 591 U.S. at 139, the Circuit Court explained that those parolees are

granted several due process protections by statute and regulation.  Make the Road N.Y., 2025

WL 3563313, at *23 (noting that parolees are ineligible for expedited removal while on parole,

see 8 U.S.C. § 1225(b)(1)(A)(iii)(II), and that parole may only be terminated with prior written

notice or at an authorized time, see 8 C.F.R. § 212.5(e)).  Second, the Circuit Court pointed to

procedural due process concerns, noting especially the difficulty of determining whether an

individual has been continuously present for at least two years in the context of a summary

procedure and mandatory detention.  Id. at *24–25.  Accordingly, even though DHS was

exercising power clearly authorized by statute, the Circuit Court found that extending the reach

of § 1225(b)(1) outside the border context was constitutionally suspect.

        As the court has explained, it is far less clear that Congress intended the reach of

§ 1225(b)(2) to extend past the border.  But even if the court found that the statute was

ambiguous and that the exercise of such power was permissible under one possible interpretation, the use of that power would present similar constitutional concerns as those noted by the District of Columbia Circuit.

The government asserts that Mr. Aguilar Tanchez's due process rights are adequately protected because he will only be detained a "short time" and because his removal proceedings are "pending and moving toward a definite endpoint." (Gov't Resp., ECF No. 5 at 20.) The government notes that in Demore v. Kim, the Supreme Court held that § 1226(c) did not violate the Due Process Clause by requiring noncitizens convicted of certain crimes to be detained throughout their removal proceedings. 538 U.S. 510 (2003). But as another district court has noted,

> [t]his holding was based on the government establishing a particular interest in detaining that limited class of noncitizens. In Demore, the Court found "[s]uch detention necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings" based on evidence before Congress when IIRIRA was enacted, demonstrating that noncitizens convicted of certain crimes were statistically more likely to abscond from removal proceedings.

Escobar Salgado v. Mattos, No. 2:25-cv-1872-RFB-EJY, 2025 WL 3205356, at *23 (Nov. 17, 2025). Here, there is no evidence that Mr. Aguilar Tanchez is a flight risk. And to the extent that his recent charges for reckless driving may imply he is dangerous, those are facts that an Immigration Judge can consider when making an individualized assessment. As the court has noted, there are 3,797,662 pending removal proceedings. Based on the finding by the Congressional Research Service that a majority of the unauthorized population (of about 15 million people) are individuals who entered without inspection, it is reasonable to estimate that around 2 million removal proceedings involve noncitizens who have not been admitted. The court has serious doubts that the mandatory detention of such a large group, without any

assessment about whether those individuals are dangerous or unlikely to appear at future hearings, comports with the due process required by the Fifth Amendment.

It is also unclear where all those individuals would be detained,[9] a practical fact that raises additional constitutional concerns. The Tenth Circuit has held that the "right to retain and consult with an attorney … implicates … clearly established First Amendment rights of association and free speech." DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990). But due to the lack of space for immigration detainees, the recent experience of this court has been that arrested individuals are quickly transported out of state and are often moved between a series of different facilities. Indeed, it has been difficult to locate some detainees, making it nearly impossible for those detainees to consult with an attorney. It is also far harder to collect the evidence and testimony that might be necessary to support an asylum claim or otherwise defend against a charge of removability while detained.

Mr. Aguilar Tanchez has not been charged criminally, but it is useful to compare the protections that would be available to him if he were. Under 8 U.S.C. § 1325, a noncitizen who "enters or attempts to enter the United States at any time or place other than as designated by immigration officers" or "eludes examination or inspection by immigration officers" may be imprisoned, for the first commission of such an offense, for "not more than 6 months." If Mr. Aguilar Tanchez were charged with such a crime, he would be represented by an attorney and the government would pay for that attorney if Mr. Aguilar Tanchez could not afford representation. He would appear promptly before a magistrate judge for an initial appearance and could ask for pretrial release.

---

[9] The total incarcerated population in the United States, including convicted state and federal prisoners, immigration detainees, and pretrial detainees, is less than 2 million.

In the civil enforcement context, an individual detained pending a removal proceeding is responsible for providing their own representation.  Moreover, the Supreme Court has held that § 1225(b)(2) allows an individual to be detained for longer than six months.  <u>Jennings</u>, 583 U.S. at 301.  Given that these potential civil penalties exceed, to some degree, the criminal penalties—and given the lack of other protections that would apply in the criminal context—, the court finds it especially important to ensure that detained noncitizens are afforded the due process provided by Congress, such as the right to a bond hearing under § 1226(a), absent a clear indication that an individual is ineligible.

The court also notes that potential constitutional problems could arise from the application of § 1225(b)(2) in the country's interior.  At the border, the Fourth Amendment balance between the interest of the Government and the privacy right of the individual is … struck much more favorably to the Government …."  <u>United States v. Montoya de Hernandez</u>, 473 U.S. 531, 539–40 (1985).  It is therefore unexceptional that individuals inspected at the border should expect that they will be deemed noncitizens until they can prove otherwise—which is what § 1225(b)(2) requires.  But it is unclear how DHS proposes to apply § 1225(b)(2) in the interior.  Who are the "examining immigration officer[s]" charged with inspecting applicants for admission?  Would any encounter with an ICE agent count as an inspection?  If so, § 1225(b)(2) requires that agent to detain an individual who "is not clearly and beyond a doubt entitled to be admitted …."  That standard is in tension with the application of the Fourth Amendment within the country's interior, which "requires that immigration stops must be based on reasonable suspicion of illegal presence, stops must be brief, arrest must be based on probable cause, and officers must not employ excessive force."  <u>Trump v. Illinois</u>, 607 U.S. —, n.4 (2025) (Kavanaugh, J., concurring).

Given these constitutional concerns, the court holds that, even if the court were to find that the INA was ambiguous, the government's reading of the statute must be rejected.

**F.  Other Considerations**

Finally, the court notes that it has some doubts that the government's proposed interpretation of § 1225(b)(2) would even apply to Mr. Aguilar Tanchez, who was detained and processed by CBP near the border.  Even if the court agreed that § 1225(b)(2) required DHS to inspect all noncitizens who are inadmissible and who have not already been detained, Mr. Aguilar Tanchez does not fall into that category.  After all, the statute does not suggest that an applicant for admission must be inspected more than once under § 1225(b)(2).  And if Mr. Aguilar Tanchez's encounter with CBP did not already qualify as an inspection, then it is difficult to understand how he remains subject to the requirements of § 1225 now.

When Mr. Aguilar Tanchez first entered the country, CBP released him on his own recognizance.  The order of release clearly stated that this conditional parole occurred under the authority granted by § 1226(a), not § 1225(b)(2): "Pursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulation, I have determined that, pending a final administrative determination in your case, you will be [released on your own recognizance]."  (ECF No. 1-2 at 37.)  In any event, § 1225(b)(2) does not authorize the release of an applicant for admission.  Instead, the applicant must apply for parole under § 1182(d)(5).  And there is no suggestion that Mr. Aguilar Tanchez applied for or was granted parole.

To the extent that DHS now argues that Mr. Aguilar Tanchez should have been detained under § 1225(b)(2), it is unclear whether he should also be entitled to the benefits of parole under § 1182(d)(5), such as the ability to apply for work authorization and to adjust his status.  Both

§§ 1226(a) and 1225(b)(2) provide due process protections to noncitizens, whether through bond hearings or the ability to apply for parole.  Having already processed Mr. Aguilar Tanchez under one framework, which provided him with certain rights but also carried certain restrictions, it is not clear whether DHS can switch horses midstream without disturbing the framework of rights and responsibilities that Congress intended.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.    Mr. Aguilar Tanchez's petition for a writ of habeas corpus (ECF No. 1) is GRANTED.

2.    The respondents are ORDERED to provide Mr. Aguilar Tanchez with a bond hearing under 8 U.S.C. § 1226(a) within 7 days from the date of this order.

3.    The respondents are ENJOINED from denying bond to Mr. Aguilar Tanchez on the basis that he is detained under 8 U.S.C. § 1225(b)(2).

4.    The respondents are further ORDERED to file a status report within 10 days from the date of this order stating whether Mr. Aguilar Tanchez has been granted bond and, if his request for bond was denied, the reasons for that denial.

DATED this 16th day of January, 2026.

BY THE COURT:

Tena Campbell
United States District Judge