IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| ANDERSON DONALD AGUILAR TANCHEZ,<br><br>    Petitioner,<br><br>v.<br><br>MARKWAYNE MULLIN,[1] in his official capacity as Secretary of the Department of Homeland Security; TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; MICHAEL BERNACKE, in his official capacity as Field Office Director of U.S. Immigration and Customs Enforcement; PAMELA BONDI, in her official capacity as the United States Attorney General; EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; and UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,<br><br>    Respondents. | **MEMORANDUM DECISION AND ORDER DENYING EMERGENCY MOTION FOR COSTS, DENYING MOTION FOR SANCTIONS, AND DENYING MOTION FOR U-VISA CERTIFICATION**<br><br>Case No. 2:25-cv-1150<br><br>Judge Tena Campbell |

Before the court are three motions filed by Petitioner Anderson Donald Aguilar Tanchez: 1) an Emergency Motion for Transportation Costs (ECF No. 14); 2) a Motion for Sanctions (ECF No. 19); and 3) a Motion for U-Visa Certification (ECF No. 20). For the following reasons, the court denies these motions.

---

[1] Under Rule 25(d) of the Federal Rules of Civil Procedure, Secretary Mullin is automatically substituted for his predecessor.

## BACKGROUND

Mr. Aguilar Tanchez filed a petition for a writ of habeas corpus on December 22, 2025, after he was detained by Respondent U.S. Immigration and Customs Enforcement (ICE).  (ECF No. 1; Decl. Matthew Randall, ECF No. 5-1 at ¶ 11.)  According to a revised interpretation of the Immigration and Nationality Act (INA) issued by the Department of Homeland Security (DHS) several months earlier, the agency detained Mr. Aguilar Tanchez without the possibility of release on bond under 8 U.S.C. § 1225(b)(2).  Shortly after receiving the petition, the court issued an emergency order prohibiting the Respondents from transferring Mr. Aguilar Tanchez out of the District of Utah or removing him from the United States.  (Emergency Order, Dec. 22, 2025, ECF No. 2.)  Nevertheless, because ICE does not have detention facilities or contracts with detention facilities in Utah that can accommodate detainees for longer than 72 hours, ICE transferred Mr. Aguilar Tanchez to the Uinta County Detention Center in Wyoming.  (Randall Decl. ¶¶ 13–14.)  It appears that after Mr. Aguilar Tanchez was detained, he was scheduled for a hearing in his removal proceeding before the Las Vegas Immigration Court on January 26, 2026.[2]  (Id. ¶ 15.)

The court ordered the Respondents to show cause why the petition should not be granted and heard argument on December 31, 2025.  (Order to Show Cause, Dec. 22, 2025, ECF No. 3; Min. Entry, Dec. 31, 2025, ECF No. 9.)  On January 16, 2026, the court issued an order agreeing with Mr. Aguilar Tanchez that the agency's interpretation of the statute was unlawful.  (Mem. Decision & Order Granting Pet., Jan. 16, 2026, ECF No. 11 at 35.)  The court therefore granted the petition and ordered the Respondents to provide Mr. Aguilar Tanchez with a bond hearing

---

[2] Mr. Aguilar Tanchez had previously been scheduled to appear at the Salt Lake City Immigration Court in West Valley City on October 24, 2025, but the Executive Office of Immigration Review (EOIR) canceled that hearing.  (Randall Decl. ¶ 7.)

under 8 U.S.C. § 1226(a) within seven days.  (Id.)

On Wednesday, January 21, 2026, Respondent Executive Office for Immigration Review (EOIR) issued a bond hearing notice.  (Resp'ts' Consol. Resp., ECF No. 29 at 4.)  But that notice set the bond hearing for January 26, 2026, the date on which Mr. Aguilar Tanchez already had a hearing scheduled in his removal proceeding before the Las Vegas Immigration Court.  (Id.) That date was too late to comply with the court's order for a bond hearing within seven days (i.e., by January 23, 2026).  DHS therefore filed notice of this court's order with EOIR.  (Id.)

In the meantime, the Respondents were also working to transport Mr. Aguilar Tanchez to Las Vegas.  The court received an email from Respondents' counsel on Wednesday, January 21, 2026, at 10:35 a.m. noting that Mr. Aguilar Tanchez was still at the Uinta County Detention Center in Wyoming and asking if the court had concerns about transferring him to Nevada so that he could have a bond hearing at the Las Vegas Immigration Court.  The court responded that it had no objections and would issue an order after the Respondents filed the appropriate motion. At 11:26 a.m., Mr. Aguilar Tanchez's counsel also responded and stated that he did not object to a transfer for the purpose of a bond hearing.  After receiving the Respondents' motion, the court issued an order at 1:01 p.m. granting leave for the Respondents to transfer Mr. Aguilar Tanchez "for purposes of his personal appearance in Immigration Court bond hearings and any ancillary proceedings …."  (Order Granting Mot. Transfer, Jan. 21, 2026, ECF No. 13 at 1.)

That transfer turned out to be unnecessary.  At some point on Wednesday afternoon, the Immigration Court issued an order setting the bond hearing for 8:00 a.m. the next morning. (ECF No. 29 at 5.)  Mr. Aguilar Tanchez was not present at the hearing, but his counsel waived the Petitioner's presence, and the Immigration Judge granted release under bond.  (Id.)  Mr. Aguilar Tanchez's family paid the bond by 12:57 p.m. that afternoon.  (Bond Receipt, Ex. 3 to

3

Pet'r's Reply, ECF No. 30-3.)

Despite these developments, Mr. Aguilar Tanchez was still transported to Las Vegas. According to a declaration submitted by an ICE Deportation Office in the Salt Lake City Field Office, Mr. Aguilar Tanchez arrived in Salt Lake City by bus from Wyoming sometime "in the late morning or early afternoon" on January 22, 2026. (Decl. Mark Shumaker, ECF No. 29-1 at ¶ 12.) Mr. Aguilar Tanchez's detention history reflects that he was booked into a holding cell in Salt Lake City somewhat earlier, at 8:00 a.m. (See Det. Hist., ECF No. 29-2 at 6.) According to that document, Mr. Aguilar Tanchez was booked out of the Salt Lake City holding cell at 1:56 p.m. (Id.) He was then booked into a facility in Pahrump, Nevada, at 11:00 p.m. that evening. (Id. ¶ 14.)

The next day, Friday, January 23, 2026, Mr. Aguilar Tanchez remained in detention at 12:07 p.m., at which point his counsel filed an emergency motion asking for his release. (ECF No. 14.) After emailing the United States Attorney's Office and Mr. Aguilar Tanchez's counsel and receiving no clear indication about when Mr. Aguilar Tanchez would be released, the court held an emergency telephone status conference. Based on the representations made during that conference, the court issued an order directing the immediate release of Mr. Aguilar Tanchez. (Order for Immediate Release, Jan. 23, 2026, ECF No. 16.) Specifically, the court ordered ICE to release Mr. Aguilar Tanchez by 6:30 p.m. Mountain Standard Time (MST) that evening. (Id. at 2.) This time accounted for the Respondents' representations about when it would be possible to release Mr. Aguilar Tanchez. Nevertheless, Mr. Aguilar Tanchez was not released until either 7:20 p.m. or 8:20 p.m. MST.[3]

---

[3] Mr. Aguilar Tanchez's detention history reflects that he was released at "1920" but does not state the time zone. (See ECF No. 29-2 at 6.) While the Respondents submit that Mr. Aguilar Tanchez was released at 7:20 p.m. MST (see ECF No. 29 at 7), Mr. Aguilar Tanchez argues that

**LEGAL STANDARD**

### I.      Civil Contempt

The primary purpose of a civil contempt sanction is "to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." Law v. Nat'l Collegiate Athletic Ass'n, 134 F.3d 1438, 1442 (10th Cir. 1998) (quoting McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949)).  A party seeking a contempt order has the burden to establish, by clear and convincing evidence, that "a valid court order existed, that the defendant had knowledge of the order, and that the defendant disobeyed the order."  Reliance Ins. Co. v. Mast Constr. Co., 159 F.3d 1311, 1315 (10th Cir. 1998).  If a party "takes all reasonable steps and substantially complies with the court order[,]" that party may avoid a finding of civil contempt.  Spectra Sonics Aviation, Inc. v. Ogden City, 931 F.2d 63 (table), 1991 WL 59359, at *2 (10th Cir. 1991) (citations omitted).  And even if a movant establishes a prima facie case of civil contempt, the court retains broad discretion in determining whether to exercise its authority to hold a party in contempt.  Id.  "Civil contempt is an appropriate remedy for the enforcement of a judicial decree, but it is a severe one which should be used only when necessary to sustain the authority of the court."  NLRB v. Shurtenda Steaks, Inc., 424 F.2d 192, 194 (10th Cir. 1970).

### II.     U-Visa Certification

A U-Visa grants temporary immigration status to nonimmigrants who have suffered substantial physical or mental abuse as a result of having been victims of certain crimes who have information that may be helpful in the investigation of those crimes.  8 U.S.C.

---

his family members were still waiting for his release at 7:56 p.m. MST (see ECF No. 19 at 3), suggesting that he was not released until 8:20 p.m. MST (i.e., 7:20 p.m. PST).

§ 1101(a)(15)(U).  Before submitting an application to the United States Citizenship and Immigration Services (USCIS), an applicant must first obtain "a certification from a Federal, State, or local law enforcement official, prosecutor, judge, or other Federal, State, or local authority investigating criminal activity described in section 1101(a)(15)(U)(iii) of this title."  Id. § 1184(p)(1).  The certifying official must affirm that the applicant "has been helpful, is being helpful, or is likely to be helpful" in the investigation or prosecution of the criminal activity listed in the statute.  Id.  Criminal activity that qualifies for U-visa certification includes kidnapping, unlawful criminal restraint, and false imprisonment.  Id. § 1101(a)(15)(U)(iii).

**ANALYSIS**

### I.      Civil Contempt

Mr. Aguilar Tanchez asserts that, because the Respondents transported him to Las Vegas after he had already been released on bond, and because he was then detained until nearly the end of the next day, the court should find the Respondents in contempt of the court's orders. Indeed, Mr. Aguilar Tanchez suggests that he was falsely imprisoned as a result of this delayed release.

The court disagrees.  As of 11:26 a.m. on Wednesday, January 21, all parties—including Mr. Aguilar Tanchez's counsel—agreed that Mr. Aguilar Tanchez should be transported to Las Vegas so that he could be present for his bond hearing.  The court entered an order at 1:01 p.m. that day permitting the transfer and, just over 24 hours later (after having been transported from Evanston to Salt Lake City that morning), Mr. Aguilar Tanchez was leaving Salt Lake City on his way to Las Vegas.  The evidence suggests that Mr. Aguilar Tanchez was booked out of the Salt Lake City facility and boarding the bus at 1:56 p.m., approximately one hour after his family paid his bond at 12:57 p.m.

While the court understands Mr. Aguilar Tanchez's frustration that he was transported from Salt Lake City to Las Vegas after he had been released on bond and that bond had been paid, the court finds nothing unusual about what occurred given the quickly changing circumstances.  Managing the transportation of detainees is a bit like steering an aircraft carrier—it is difficult to change course once the process has been set in motion.  The court has been forced to reschedule many criminal hearings where a defendant was not transported to the court because the schedule changed only the day before.  The court finds that Mr. Aguilar Tanchez's transport was arranged according to the court's order and that there was insufficient time to change that arrangement on either the evening of January 20, 2026, or the next morning.  Similarly, the court is not persuaded by Mr. Aguilar Tanchez's suggestion that something is amiss with the Respondents' assertion that the ride to Las Vegas lasted approximately nine to ten hours.  Prison transport vehicles require more time than ordinary travel for loading, unloading, and rest stops.  Having left Salt Lake City around 2:00 p.m., it was reasonable that Mr. Aguilar Tanchez arrived in Pahrump around 11:00 p.m. that evening.

The court is more concerned that Mr. Aguilar Tanchez was not released promptly the next morning.  But administrative processing can take time, and the court finds that the day-long delay is insufficient to merit a finding of contempt.  Notably, the court's order directing the Respondents to provide Mr. Aguilar Tanchez with a bond hearing did not provide a specific timeframe for his release if an immigration judge granted him bond.  (See ECF No. 11 at 35.)  Instead, the court ordered that the Respondents provide Mr. Aguilar Tanchez with a bond hearing by January 23, 2026.  (Id.)  And by the end of the day on January 23, 2026, Mr. Aguilar Tanchez had been released.

It is true that the Respondents did not comply with the terms of the court's order for

7

immediate release, which directed that Mr. Aguilar Tanchez be released before 6:30 p.m. MST. But the court acknowledges the Respondents' assertion that this delay was attributable at least in part to the transportation required between the facility in Pahrump and an office in Las Vegas, where Mr. Aguilar Tanchez was released. (ECF No. 29 at 6–7.) In any event, the purpose of the court's order was to ensure that Mr. Aguilar Tanchez was released by the end of the day—and, while the court sympathizes with both Mr. Aguilar Tanchez and his family, who faced a great deal of uncertainty during the lengthy wait, Mr. Aguilar Tanchez was, in fact, released by the end of the day. A finding of contempt is therefore unnecessary to enforce compliance with the court's orders. And, without minimizing the emotional toll on Mr. Aguilar Tanchez and his family, the court finds that financial compensation for the extra hours Mr. Aguilar Tanchez was detained is not warranted on this record.

In sum, the court finds that the Respondents substantially complied with the court's orders, including the court's order providing for a bond hearing, the court's order permitting Mr. Aguilar Tanchez to be transported to Las Vegas, and the court's order directing Mr. Aguilar Tanchez's immediate release.

## II.    U-Visa Certification

Given that the Respondents substantially complied with the court's orders, the court finds no evidence that the Respondents or any ICE agents committed a crime. And the court finds unpersuasive the cases cited by Mr. Aguilar Tanchez in support of his motion for U-visa certification. (See Pet.'s Suppl. Mem., ECF No. 28.) Two cases involved allegations of forced labor against private entities. See Garcia v. Audubon Cmtys. Mgmt., LLC, No. 08-1291 (E.D. La.) (alleging that noncitizens were the victims of forced labor and human trafficking at the hands of an employer); Menocal v. The GEO Grp., Inc., No. 14-cv-2887 (D. Colo.) (involving

8

allegations of forced labor against a for-profit private prison contractor).  The third case involved a noncitizen who was kept shackled "during the final stages of active labor and her post-partum recovery …."  Villegas v. Metro. Gov't of Nashville, 907 F. Supp. 2d 907, 911 (M. D. Tenn. 2012).  These allegations go well beyond the suffering associated with a delayed release from detention.  Moreover, the court did not address whether the alleged false imprisonment and kidnapping that occurred as a result of the detainee's shackling during her pregnancy constituted "qualifying criminal activity" under the U-visa statute because any prosecution for those crimes was barred by the statute of limitations.  Id. at 913.  Mr. Aguilar Tanchez has failed to provide the court with any examples of a ruling holding that a day-long delay in a detainee's release from incarceration amounts to the crime of false imprisonment.

In any event, to be eligible for a U-visa, a noncitizen must have "suffered substantial physical or mental abuse as a result of having been a victim of criminal activity …."  8 U.S.C. § 1101(a)(15)(U)(i)(I).  Although the court recognizes the emotional toll that detention imposes on detainees, the court finds that the additional 24 to 30 hours that Mr. Aguilar Tanchez spent in detention did not rise to the level of "substantial physical or mental abuse" and was not the result of any criminal activity.  Given this finding, the court need not address the Respondents' additional argument that U-visa certification "is not appropriate where the court's only role has been to oversee a civil proceeding brought by an applicant and there is no pending investigation or prosecution of the alleged qualifying criminal activity at issue in the civil case."  Villalta Canales v. Caw, 552 F. Supp. 3d 534, 537 (D. Md. 2021) (citation omitted).

### III.   Transportation Costs and Fees

Mr. Aguilar Tanchez has requested that the Respondents pay the costs of his transportation from Las Vegas back to Salt Lake City.  Because the court finds that the

Respondents substantially complied with the court's order permitting Mr. Aguilar Tanchez to be transported to Las Vegas, the court denies this request.

Despite this finding, the court notes that it is not persuaded by the government's argument that, in any event, Mr. Aguilar Tanchez would have been required to travel to Las Vegas for an immigration hearing at some point. The Notice to Appear issued when Mr. Aguilar Tanchez was originally processed after crossing the border required him to appear before an immigration judge at the Salt Lake City Immigration Court in West Valley City, Utah. (Not. Appear, ECF No. 1-2 at 38.) It appears that the Las Vegas hearing was scheduled after the government detained Mr. Aguilar Tanchez without bail under 8 U.S.C. § 1225. Had the government provided Mr. Aguilar Tanchez with an immediate bond hearing under 8 U.S.C. § 1226, there is no reason why he could not have received this hearing in the Salt Lake City area. The court is concerned about noncitizens being detained, transported out of district, and forced to find their own way home after being released on bond. But where courts have awarded transportation costs in similar situations, it appears that these awards have been based on findings of civil contempt. See, e.g., Fernando T. v. Noem, No. 26-cv-445, 2026 WL 508807, at *4 (D. Minn. Feb. 23, 2026) (awarding $568.29 for the cost of a plane ticket where the petitioner was transferred out of the district in violation of the court's order).[4] Given the unique

---

[4] The court has considered whether awarding transportation costs would be appropriate under the Equal Access to Justice Act (EAJA), which provides that

> a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action.

28 U.S.C. § 2412(a)(1). But because travel costs are not authorized in § 1920, the court declines to award Mr. Aguilar Tanchez any reimbursement for his return to Salt Lake City under this

10

circumstances of this case, in which Mr. Aguilar Tanchez was transported to Las Vegas only after the Respondents sought the court's permission, the court will not award compensatory civil sanctions.

But under the Equal Access to Justice Act (EAJA), the court must consider whether an award of attorneys' fees is appropriate.  (See ECF No. 1 at 9 (requesting costs of suit and attorneys' fees under EAJA).)  The statute provides that

> [e]xcept as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).  Accordingly, a fee award is required under EAJA if "(1) plaintiff is a 'prevailing party'; (2) the position of the United States was not 'substantially justified'; and (3) there are no special circumstances that make an award of fees unjust."  Hackett v. Barnhart, 475 F.3d 1166, 1172 (10th Cir. 2007) (quoting 28 U.S.C. § 2412(d)(1)(A)).  The Tenth Circuit has held that fee awards are available for prevailing petitioners in immigration habeas actions.  Daley v. Ceja, 158 F.4th 1152, 1166 (10th Cir. 2025) ("[W]e read the EAJA's broad language to unambiguously authorize fees in habeas actions challenging immigration detention.").

Here, because the court found that Mr. Aguilar Tanchez's legal position concerning the proper interpretation of the Immigration and Nationality Act was correct, he is a prevailing party for purposes of the statute and may therefore file a motion for an award of reasonable attorneys' fees within 30 days after the court enters final judgment.  See 28 U.S.C. § 2412(d)(1)(B);

---

statute.  And Mr. Aguilar Tanchez has not cited any other authority under which the court could make such an award.

DUCivR 54-1(a).

The court awards attorneys' fees related to the emergency motion that Mr. Aguilar Tanchez's counsel filed on January 23, 2026, the telephone conference that the court held that afternoon, and any additional time that Mr. Aguilar Tanchez's counsel worked to ensure Mr. Aguilar Tanchez's release that evening.  Even though the court has found that the Respondents' actions did not rise to the level of contempt, the court is nevertheless concerned about how difficult it was to receive any information about Mr. Aguilar Tanchez's detention status from the Respondents, despite the best efforts made by attorneys in the United States Attorney's Office.

DHS's revised interpretation of the INA requires the mandatory detention of a large class of noncitizens who were previously released on bond.  As the court has elsewhere highlighted, DHS and ICE must be prepared to respond to court orders and provide counsel with information about a detainee's status and location.  See Reyes v. U.S. Immigr. & Custom Enf't, No. 2:25-cv-1159, 2026 WL 266952, at *1 (D. Utah Feb. 2, 2026) ("If ICE continues to detain noncitizens without a bond hearing under the authority of § 1225 while that issue is considered by other courts, the agency must be prepared for additional lawsuits, requests about a detainee's status and location, and the need to respond to court orders"); see also Juan T.R. v. Noem, No. 26-cv-107, 2026 WL 555601, at *2 (finding that ICE violated 97 orders in 66 cases in the District of Minnesota and noting that ICE had significantly increased detentions in Minnesota "without making any provision for handling the hundreds of lawsuits that were sure to follow").  To the extent that DHS cannot provide this information promptly when requested by the court, the court finds it reasonable to award attorneys' fees for the additional efforts required by counsel to ensure that a detainee has been released.

The court will not award attorneys' fees for the additional motions that Mr. Aguilar

12

Tanchez filed related to sanctions and U-visa certification, as he is not a prevailing party on those issues. But an award of attorneys' fees for the underlying petition presents a closer question. While this court sided with the majority of courts in finding that DHS's revised interpretation of the INA was unlawful, some courts have issued contrary holdings. The court will therefore consider any arguments about whether the Respondents' position was substantially justified before awarding fees for the petition itself.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.     The court DENIES the Petitioner's Emergency Motion for Costs (ECF No. 14), which is the only relief requested in the motion that remains pending.

2.     The court DENIES the Petitioner's Motion for Sanctions. (ECF No. 19.)

3.     The court DENIES the Petitioner's Motion for U-Visa Certification. (ECF No. 20.)

4.     The Petitioner may file a motion for attorneys' fees within 30 days. The court awards the Petitioner reasonable attorneys' fees for the costs of filing the Emergency Motion, the subsequent telephone conference on January 23, 2026, and any time after the telephone conference that Petitioner's counsel worked to ensure that the Petitioner was released from custody that day. The court will not award attorneys' fees for the Petitioner's subsequent motions. The court will determine whether attorneys' fees are appropriate for the underlying petition after considering argument about whether the Respondents' position was substantially justified. The Respondents must file any objections to the Petitioner's motion for attorneys' fees within 14 days after the Petitioner files his motion.

5.      Having addressed the pending motions, the court will concurrently enter final judgment granting the petition for a writ of habeas corpus.

DATED this 26th day of March, 2026.

BY THE COURT:

_____
Tena Campbell
United States District Judge

14